## MADISON Y. JOHNSON

*v.*

## J. RUSSELL JONES *et al.*

1. PERSONAL LIBERTY — *how a citizen may be deprived thereof — power of the President of the United States, in that regard.* A citizen has a right to his personal liberty, except when restrained of it upon a charge of crime, and for the purpose of judicial investigation, or under the command of the law pronounced through a judicial tribunal.

2. The President of the United States has no rightful power, *in time of peace,* to cause a marshal to arrest a citizen of one State, without process, and without any charge of crime legally preferred, and convey him to another State, and there imprison him, without judicial writ or warrant, in a military fortress.

·3. In time of war, any soldier has the right to arrest a belligerent engaged in acts of hostility toward the government, and lodge him in the nearest military prison, and to use such force as may be necessary for that purpose even unto death. This is the law of war.

4. But the status of any person, as to the question of belligerency, depends upon his citizenship or nationality. A belligerent is a subject of the hostile power, and his character, in that regard, depends upon that of the community to which he belongs.

5. So in the late war of the rebellion, the people of the rebel States were recognized as belligerents, but the citizens of the loyal States, resident and remaining therein, and not engaged in the war, were not belligerents or subject to arrest as prisoners of war, notwithstanding they may have been domestic plotters against the government, in full sympathy with the rebels and rendering them their moral co-operation and aid.

6. Military law, as distinguished from martial law, consists of the rules prescribed for the government and discipline of troops, which apply only to persons in the military or naval service of the government, whereas martial law, when once established, applies alike to citizen and soldier.

7. But martial law is in truth and reality no law, but merely the will of the military commander, to be exercised by him only on his responsibility to his government or superior officer.

8. Martial law must be permitted to prevail on the actual theater of military operations, in time of war, as an unavoidable necessity. So, if a commanding officer finds within his lines a person, whether citizen or alien, giving aid or information to the enemy, he can arrest and detain him so long as may be necessary for the security or success of his army.

9. But, beyond the enforcement of martial law on the actual field of military operations, and its establishment in districts which, though remote from the seat of war, are yet so far in sympathy with the public enemy as to obstruct the administration of the laws through the civil tribunals, and render a resort to the military power a necessity, as the only means of restraining disloyalty from overt acts, and preserving the authority of the government, there seems to be no ground upon which it can be properly exercised. A state of war does not, of itself, suspend, at once and everywhere, the constitutional guaranties of the liberty of the citizen.

10. And, though the government be engaged in war, in the suppression of a rebellion in certain parts of the country, in those portions not engaged in the rebellion, where the civil courts, in the midst of loyal communities, are in the undisturbed exercise of their ordinary jurisdiction, martial law cannot properly exist, and the federal executive has no power to cause the arrest of citizens in such communities, for alleged disloyal practices therein, under his authority as commander-in-chief, and as incident to a state of war, and any person making such arrest by direction of the President, must respond in damages to the party so illegally deprived of his liberty.

11. POWER OF CONGRESS *over rights in the States.* Congress has no power to interfere with the remedies furnished by State laws, through State tribunals, for the injury of one citizen by another.

12. So where a person was illegally deprived of his liberty, under an order of the President of the United States, the remedy given by the laws of the State, in favor of the injured party against the person making the arrest, cannot be taken away by any subsequent act of congress.

13. MITIGATION OF DAMAGES — *in trespass for an illegal arrest and false imprisonment.* In an action of trespass against a civil officer for illegally arresting and imprisoning the plaintiff, while it is no bar to the action for the defendant to plead that the arrest was made under the order of the President, in time of war, for alleged disloyal practices of the plaintiff, yet such alleged facts may be proved in mitigation of vindictive or exemplary damages, and for the purpose of rebutting the presumption of malice. Mr. Justice BREESE dissenting.

14. PRACTICE — *where a part of several defendants in trespass plead specially — rights of the other defendants.* An action of trespass is several as to each defendant, and each has a right to make his own defense and to have it tried without being compelled to rely upon a defective defense made by a co-defendant.

15. Where one of several defendants in such action pleads specially such matter as shows the plaintiff cannot maintain his action against either, and the other defendants plead the general issue only, upon a demurrer to the special plea being overruled, and the plaintiff abides by his demurrer,—the defendants pleading the general issue have their option, either to claim the benefit of the judgment on demurrer in favor of their co-defendant, or to insist on a trial of the issue made by their own plea.

16. If the defendants who plead the general issue only, seek to avail themselves of the judgment of the court on the special plea of their co-defendant, and the court permits it, the plaintiff can except, and preserve against them in the record, the same question raised by his demurrer to the special plea.

17. But, if those defendants pleading the general issue insist upon a trial of that issue as to them, notwithstanding the ruling upon the demurrer to the special plea of their co-defendant, then, on such trial, a verdict and judgment may be had according to the proof.

APPEAL from the Circuit Court of Jo Daviess county; the Hon. BENJAMIN R. SHELDON, Judge, presiding.

The opinion of the court contains a statement of the case.

Mr. M. Y. JOHNSON and Mr. DAVID SHEEAN, for the appellant.

Mr. C. BECKWITH, with whom were Mr. B. F. AYER and Mr. F. H. KALES, for the appellees.

Mr. JUSTICE LAWRENCE delivered the opinion of the Court:

This was an action of trespass brought by Madison Y. Johnson against J. Russell Jones, Elihu B. Washburne, John C. Hopkins, Oliver P. Hopkins and Bradner Smith. The declaration alleges that on the 28th day of August, 1862, in the county of Jo Daviess, and State of Illinois, the defendants with force and violence assaulted and arrested the plaintiff, and conveyed him on board the railway cars; that they transported him by the cars to Chicago, where they restrained him of his liberty for the space of two days; that they then conveyed him by force to the city of New York; that he was there imprisoned in Fort Lafayette for the space of two months; that he was then taken to Fort Delaware, in the State of Delaware, where he was imprisoned for the further space of three months, when he was set at liberty without trial or examination or any offense being charged against him.

All the defendants pleaded not guilty. The defendants Jones, Hawkins and Hopkins also filed special pleas, in which they set up the then existence of the rebellion, and aver that the plaintiff was an active member of a disloyal secret society known as the "Knights of the Golden Circle;" that this society was in league and sympathy with the rebels, and was a co-operating branch of the rebellion in the northern States, and plotting with the rebels for the overthrow of the government; and that said plaintiff was deeply engaged in aiding said society in their treasonable purposes, and was in fact levying war against the United States. The pleas further aver that the defendant Jones was at that time United States marshal for the northern district of Illinois, and that said defendants Hawkins and Hopkins were his deputies; that as such marshal he was ordered by the President of the United States to arrest said plaintiff, as a measure proper for the suppression of the rebellion, and convey him to Fort Lafayette; and that he did so arrest him and convey him to said fort in a comfortable

10 — 44TH ILL.

manner, and there delivered him to the custody of the officer in command of said fort, after which time the plaintiff was not in the custody of the defendant.

Another plea sets up the issuance of the President's proclamation of July 4, 1862, calling for three hundred thousand volunteers, and avers that the plaintiff was actively engaged in discouraging and preventing volunteering.

To these special pleas the plaintiff demurred. The demurrer was overruled, and, the plaintiff abiding by it, the court rendered final judgment on the demurrer in favor of the defendants who pleaded specially. The court then, on motion of those who had only pleaded not guilty, and against the objection of the plaintiff, impaneled a jury to try the issue made by that plea, and, the plaintiff offering no evidence, a verdict and judgment were given for those defendants. The plaintiff has brought the record to this court.

It will be observed that, when the arrest was made for which this suit was brought, there had been no general suspension of the writ of *habeas corpus*. We are not, therefore, under the necessity of considering the effect of a suspension of that writ upon the right of the government to make military arrests — a subject upon which eminent jurists have widely differed. This plaintiff was arrested on the 28th of August, 1862. The first proclamation of the President applicable to the State of Illinois, and to all persons anywhere arrested by the military authorities, was issued September 24, 1862. Doubts having been expressed as to the power of the President to suspend the writ without the authorization of congress, that body, on the 3d of March, 1863, passed an act authorizing the President to suspend it wherever, in his judgment, the public safety should require it. Acting under this authority, the President issued his second proclamation of the 15th of September, 1863. We refer to these historical facts, merely for the purpose of showing that the present case must be adjudged without reference to the question of what power the President had to make arrests during the late rebellion after the writ had been suspended.

Do these pleas, as above set forth, justify the alleged trespass?

That the President of the United States has the rightful power, *in time of peace*, to cause a marshal to arrest a citizen of Illinois, without process, and without any charge of crime legally preferred, and convey him to a distant State, and there imprison him, without judicial writ or warrant, in a military fortress, is a proposition which no one would have the hardihood to assert. That such power, in a season of peace, cannot be safely intrusted to any government by a people claiming to be free, is a political truism lying beyond the domain of argument. The right of the citizen to his personal liberty, except when restrained of it upon a charge of crime, and for the purpose of judicial investigation, or under the command of the law pronounced through a judicial tribunal, is one of those elementary facts which lie at the foundation of our political structure. The cardinal object of our Constitution, as it is the end of all good government, is to secure the people in their right to life, liberty and property. The more certainly to attain this end, the framers of our Constitution not only proclaimed certain great principles in the bill of rights, but they distributed governmental power into three distinct departments, each of which, while acting in its proper sphere, was designed to be independent of the others. To the legislative department it belongs to declare the causes for which the liberty of a citizen may be taken from him, to the judicial department to determine the existence of such causes in any given case, and to the executive to enforce the sentence of the court. If a citizen can be arrested, except upon a charge of violated law, and for the purpose of taking him before some judicial tribunal for investigation, then it is plain that the executive department has usurped the functions of the other two, and the whole theory of our government, so far as it relates to the protection of private rights, is overthrown.

But on this question we are not left merely to arguments drawn from the general spirit and object of our Constitution. Our forefathers had fresh in their memory the struggles which it had cost in England to secure those two great charters of

freedom, the magna charta of King John's time, and the bill of rights of 1688, and they incorporated into our fundamental law whatever was most valuable in those instruments for the security of life, liberty and property. They provided in article 4 of the amendments, that " The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated; and no warrants shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." They further provided, in article 5, that " No person shall be deprived of life, liberty or property, without due process of law," and in article 6, that " In all criminal prosecutions the accused shall enjoy the right of a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor; and to have the assistance of counsel for his defense."

It cannot be denied, that when this plaintiff was arrested without writ or warrant, and conveyed by the marshal to the city of New York, and there delivered, not into the custody of the law upon a criminal charge, but to a military officer to be imprisoned in a military fortress without judicial investigation, and without even the charge of crime, the letter and the spirit of all the foregoing provisions of the Constitution were plainly violated, unless, under the state of facts set forth in the pleas, their operation as to the plaintiff had been temporarily suspended. Was such the fact? On the answer to this question must depend the decision of this case.

It is urged by the counsel for the defendant, that, although the government cannot lawfully make an arrest of this character in time of peace, the power is necessarily incident to a period of war, when exercised in regard to those who are giving aid and comfort to the enemy. The argument, briefly stated, is as follows: The facts set up in the plea, and admitted by the

demurrer show, that the plaintiff was co-operating with the rebels. The rebellion was more than an insurrection. It was a public war, as decided by the Supreme Court of the United States, in the prize cases, reported in 2 Black, 635, at least after the passage of the act of congress, of July 13th, 1861. Being a public war, the government could exercise both belligerent and sovereign rights. While the rebels did not cease to be rebels, they were at the same time public enemies, and the government had the right so to treat them, notwithstanding they were citizens of the United States. It could exercise against them as public enemies all the powers given or recognized by the laws of war, and if the plaintiff was co-operating with them in the manner stated in these pleas, he too was a public enemy, and liable, not merely to prosecution in the civil courts, but to be arrested and imprisoned by the military power as a prisoner of war, or a belligerent.

We have tried to state the argument of the defendants' counsel fairly. Its fallacy consists in the assumption, that the plaintiff, by virtue of the facts alleged in the pleas, could be regarded as a belligerent in any such sense as to make him a prisoner of war. There is, it is true, in the third plea, an allegation that "the plaintiff was in fact engaged in levying war against the government of the United States," but this averment is too vague and general to be regarded by the court in any other light than as the conclusion or inference drawn by the pleader from his previous averments, in the plea, of specific facts. These averments are, that there was a secret political organization known as the "Knights of the Golden Circle;" that this organization was hostile to the government, and in close counsel and sympathy with the rebels, and a co-operating branch of the rebellion in the Northern States; that it was constantly planning and plotting with the rebels for the success of the rebellion, and that the plaintiff was an active member of said society, at the county of Jo Daviess and State of Illinois, and deeply engaged in aiding it in its treasonable purposes, and was in fact levying war against the government in the county aforesaid.

On the familiar principle that a pleading is to be construed most strongly against the pleader, all that the court can intend from this plea is, that the plaintiff was an active member of a disloyal secret society at the North, whose purposes were treasonable, and whose object was to aid the rebellion, and that said society, and the plaintiff as one of its members, were holding counsel with the rebels and plotting for their success. The first special plea avers that the plaintiff was discouraging enlistments, but the foregoing is the one relied on, and comprises the substance of the defense. It will be observed that the offenses which this plea charges against the plaintiff are laid as committed in the county of Jo Daviess and State of Illinois. It is, also, to be observed that the plea nowhere charges the plaintiff with being in the service of the rebel government, or with being in any manner connected either with the rebel army or the rebel government, except so far as through his membership of this alleged disloyal society at the North, he and the rebels were working for a common purpose. But no *act* of co-operation is averred against him, nor is it alleged that he furnished information or supplies to the rebel forces. It is not averred that he took up arms against the government, or committed any overt act of war or had ever done so. The substance of the plea is, that he was a domestic plotter against the government, in full sympathy with the rebels, and rendering them his moral co-operation and aid.

The plaintiff, if guilty of these offenses, merited not only the condemnation of all loyal and honorable men, but the severest legal punishment. On the 17th of July, 1862, which was prior to his arrest, congress had passed a law designed to reach cases of this character. The act authorized imprisonment not exceeding ten years, and a fine not exceeding ten thousand dollars, in the discretion of the court, to be pronounced against any person found guilty of giving aid and comfort to the rebels. Under this law a warrant might have been sued out in legal form against the plaintiff, by virtue of which the marshal could have arrested him and delivered him into the custody of the law for trial in the United States Court for the Northern Dis-

trict of Illinois. But do these offenses, charged in these pleas, make the plaintiff a belligerent, to be captured and held as a prisoner of war?

If the plaintiff was a belligerent, as insisted by the defendants' counsel, the order of the President was wholly unnecessary to authorize the arrest. Any soldier has the right, in time of war, to arrest a belligerent engaged in acts of hostility toward the government, and lodge him in the nearest military prison, and to use such force as may be necessary for that purpose — even unto death. This is the law of war, to which the defendants appeal for their justification. Have counsel considered to what this theory of belligerency among our own citizens would have led, if reduced to practical application in the late war?

It is however a contradiction in terms to speak of a citizen of a loyal State, remaining in such State, and not engaged in the war, as a belligerent. A belligerent is a subject of the hostile power, and his character, in that regard, depends upon that of the community to which he belongs. In the case *Ex parte Milligan*, recently decided in the Supreme Court of the United States, the same point was made, and set at rest by the court in the following language:

"But it is insisted, that Milligan was a prisoner of war, and therefore excluded from the privileges of the statute. It is not easy to see how he can be treated as a prisoner of war, when he lived in Indiana for the past twenty years; was arrested there, and had not been, during the late troubles, a resident of any of the States in rebellion. If, in Indiana, he conspired with bad men to assist the enemy, he is punishable for it in the courts of Indiana; but, when tried for the offense, he cannot plead the rights of war; for he was not engaged in legal acts of hostility against the government, and only such persons, when captured, are prisoners of war. If he cannot enjoy the immunities attaching to the character of a prisoner of war, how can he be subject to their pains and penalties?"

This was the language of the majority of the court, speaking through Mr. Justice DAVIS, and although on another

point there was a dissenting opinion, on this there was entire unanimity. It will be remembered that Milligan having been charged with offenses of the same general character with those alleged against this plaintiff in the pleas, and tried before a military commission, and sentenced to be hung, had presented a petition to the Circuit Court of the United States for the district of Indiana, praying for his discharge under the provisions of the act of congress of March 3, 1863. By the express terms of the law he was entitled to the benefit of its provisions, or to his discharge under it, if held as a prisoner of war. This question, then, lay at the foundation of the case. The majority of the court dispose of it in the words above quoted. The minority, speaking through the chief justice, use language on this point not less emphatic. They say, "Milligan was imprisoned under the authority of the President, and was not a prisoner of war," and they held him entitled to his discharge under the act of congress, as he would not have been if held as a belligerent or prisoner of war.

This is decisive authority as to whether the plaintiff in the present case can be considered as having been arrested and imprisoned as a belligerent or prisoner of war. The principle indeed had already been settled by the same court in the prize cases above quoted, where they held, that all persons residing in the rebel States, whose property might be used to support the hostile power, were liable to be treated as enemies without reference to their personal loyalty. This is the settled doctrine, that the status of any person, as to the question of belligerency, depends upon his citizenship or nationality. The late rebellion grew to such consistency and magnitude, that our own as well as foreign governments recognized the people of the rebel States as belligerents, but the citizen and resident of a Northern State, did not become a belligerent, whatever may have been his sympathies, or however wicked his plots.

So far, then, as it is sought to justify the arrest of the plaintiff by assuming that he was arrested as a belligerent, and held as a prisoner of war, the argument is untenable. He was not a prisoner of war.

The foundation of the argument predicated upon the alleged belligerency of the plaintiff thus failing, it remains to be considered whether his arrest can be justified as an exercise of martial law applied to a citizen of Illinois, not in the military service. It is to be remarked, that the order for the arrest of the plaintiff is alleged to have been issued by the President as commander-in-chief, through the judge advocate general of the armies of the United States, though addressed to, and executed by the marshal of the northern district of Illinois, who is merely a civil officer. To what extent is martial law incident to a state of war?

As the phrases, "martial law" and "military law," are sometimes carelessly used as meaning the same thing, it is proper to point out the broad distinction between them. The Constitution authorizes congress to raise and support armies, and to make rules for the government thereof. Acting under this authority, congress has passed divers acts prescribing the rules and articles of war, and providing for the government and discipline of the troops. These rules constitute the military law, and are directly sanctioned by the Constitution, but they apply only to persons in the military or naval service of the government.

What is called martial law, however, has a far wider scope and application. When once established, it is made to apply alike to citizen and soldier. To call this system by the name of law seems something of a misnomer. It is not law, in any proper sense, but merely the will of the military commander to be exercised by him only on his responsibility to his government or superior officer. Sir Matthew Hale said (Hist. C. L. 54), "It is in truth and reality no law, butsome thing indulged rather than allowed as law." In the famous petition of right in the reign of Charles I., it was solemnly enacted, that ne commission should issue to proceed in England according to martial law, and the principle was re-asserted in the bill of rights of 1688. In the case of *Grant* v. *Gould*, 2 Hen. Blackst. 99, decided in the year 1792, Lord LOUGHBOROUGH said, that martial law, in the sense in which we are now considering it, did not exist in England, was contrary to the Constitution, and

had been for a century totally exploded. We make these references merely to illustrate how odious this system is to the spirit of liberty and good government. .

That martial law must be permitted to prevail on the actual theatre of military operations in time of war, is an unavoidable necessity. It results from the very nature of war, which is simply an appeal to force, and where it is being waged, it necessarily suspends and displaces the ordinary laws of the land by those usages which are known as the laws of war. If a commanding officer finds within his lines a person, whether citizen or alien, giving aid or information to the enemy, he can arrest and detain him so long as may be necessary for the security or success of his army. He can do this under the same necessity which will justify him, when an emergency requires it, in seizing or destroying the private property of a citizen. The authority to do either by military force is indispensable on the actual theatre of war. The want of such authority might lose a battle or peril the issue of a campaign. The power to do these things is implied in the power to wage war, and springs from an overruling necessity.

This is the power of a military commander on the actual scene of military operations, and where hostile armies are confronted with each other. We may, for the purposes of the present case, go further, and admit, that, if, in a district remote from the theatre of military operations, the popular sentiment is so disloyal to the government that one who aids and abets the public enemy, cannot be rendered powerless for mischief, and brought to justice by the arm of the civil law, that fact would justify the government in treating such district as virtually attached to the theatre of military operations, and in enforcing therein martial law or the laws of war, so far as might be necessary to the public safety. We may concede the right to do this as the exercise of a constitutional power, resulting from the power to wage war. Whether this right belongs to the President as commander-in-chief, or whether he must receive authority thus to act from congress, is a question not necessary for us to consider.

But beyond the enforcement of martial law on the actual field of military operations, which is the result of an overmastering necessity, and its establishment in districts which, though remote from the seat of war, are yet so far in sympathy with the public enemy as to obstruct the administration of the laws through the civil tribunals, and render a resort to military power a necessity, as the only means of restraining disloyalty from overt acts, and preserving the authority of the government, we know of no ground upon which its exercise can be defended. It is the result of an absolute necessity during a period of war, and should terminate with the necessity itself. The doctrine that a state of war of itself suspends, at once and everywhere, the constitutional guaranties for liberty and property, finds no support in the Constitution, and is inconsistent with every principle of civil liberty and free government.

But the admission that the government, by the joint action of congress and the President, or by the single action of the latter, may rightfully extend the limits of martial law beyond the actual theatre of military operations, and establish it in districts where the civil authorities are powerless to protect the public welfare against disloyal persons, does not aid the pleas in the case before us. These pleas do not aver that the plaintiff was arrested where the war was raging, or that the civil courts were not in the peaceful and uninterrupted exercise of their jurisdiction, or that the civil authority was in any degree impaired, or that martial law had been proclaimed. Neither can we presume such a condition of affairs to have existed. Indeed, it is a part of the public history of the war, of which we may well take judicial notice, that no organized rebel force ever trod the soil of Illinois, that the usual administration of the laws in this State was at no time suspended or interrupted, and that in that part of the State where this arrest was made the people were eminently distinguished for their devotion to the government and to the prosecution of the war. Neither had there, at the time of this arrest, been any official action by any department of the government establishing martial law, or suspending the writ of *habeas corpus* in the State of Illinois.

We must assume, both from the absence of any averment to the contrary in the pleas, and from the public history of the time, that this plaintiff might have been arrested by the ordinary legal process, and brought to trial before the ordinary civil tribunals, and if guilty, subjected without let or hindrance, to a merited punishment.

In the face of all these facts, how is it possible to hold that the plaintiff was legally subjected to the administration of martial law?

It is undeniable, if the government had the right to arrest him without a warrant, and imprison him without a trial, or charge of any criminal offense, it had an equal right to send his case before a court martial or military commission. The right to do the one necessarily implies the right to do the other, because both rest on the same theory of power to be exercised by the government in time of war. If it was lawful to arrest and imprison the plaintiff without any form of judicial investigation, it would certainly have been not less lawful to do the same thing upon the finding and sentence of a military tribunal. It can hardly be said that the laws of war could be applied to the plaintiff for the purposes of punishment, but not for the purposes of trial.

That he could not have been legally brought to trial before a military tribunal has been recently decided by the Supreme Court of the United States in the case *Ex parte Milligan*, already quoted. On the question whether congress has the constitutional power to establish military tribunals and martial law, in time of war, in districts where the war is not being actually waged, the court was divided. But on all those principles which govern the case now under consideration, there was entire unanimity. The majority held the imprisonment of Milligan illegal, and discharged him, on the ground that in a State where no war prevailed, and the jurisdiction of the civil courts was undisturbed, neither congress nor President, nor both united, could constitutionally create a military tribunal, or enforce martial law. The minority of the court while they dissent from this proposition, in its full extent, do nevertheless

concur in the judgment of the court discharging Milligan,. on the ground that congress had not in fact authorized the creation of military tribunals in Indiana, and because the sentence of such a tribunal, passed upon Milligan, was void, and his imprisonment illegal. The power of the executive department to try and imprison Milligan by virtue of the laws of war, and in the absence of congressional authorization is thus directly denied by the entire court.

The majority of the court say, "Martial rule can never exist where the courts are open and in the proper and uninterrupted exercise of their jurisdiction. It is also confined to the locality of actual war. Because, during the late rebellion, it could have been enforced in Virginia, where the national authority was overturned and the courts driven out, it does not follow that it should obtain in Indiana where that authority was never disputed and justice was always administered."

The minority of the court used the following language:

"Congress cannot direct the conduct of campaigns, nor can the President, or any commander under him, without the sanction of congress, institute tribunals for the trial and punishment of offenses, either of soldiers or civilians, unless in cases of a controlling necessity, which justifies what it compels, or at least insures acts of indemnity from the justice of the legislature.

"We by no means assert that congress can establish and apply the laws of war where no war has been declared or exists.

"Where peace exists the laws of peace must prevail. What we do maintain is, that when the nation is involved in war, and some portions of the country are invaded, and all are exposed to invasion, it is within the power of congress to determine in what States or districts such great and imminent public danger exists as justifies the authorization of military tribunals for the trial of crimes and offenses against the discipline or security of the army or against the public safety."

As to the main fact, that martial law did not lawfully exist in Indiana, and that the trial and imprisonment of Milligan

were illegal, the court was not divided. That case is really decisive of the one before us. The case of Milligan was the weaker of the two, in this, that, at the time of his arrest and trial, in 1864, the writ of *habeas corpus* had been suspended by authority of congress, which furnished the counsel for the government an argument in support of the theory of martial law.

A case involving in some degree the question of martial law arose in the Supreme Court of the United States in 1851. *Mitchell* v. *Harmony*, 13 How. 134. During the war with Mexico, Colonel Mitchell, acting under the orders of Colonel Doniphan, had seized the private property of Harmony, for the service of the expedition, commanded by the latter officer. Harmony, who had been following the march of the army as a trader, after arriving in the Mexican province of Chihuahua, desired to stop there, but was compelled by the commander to accompany the expedition with his wagons, mules and goods. The property was eventually lost, and an action was brought against Colonel Mitchell to recover its value. The defendant urged that it was seized and impressed into the public service from necessity, also to prevent it from falling into the hands of the enemy. The court on this point say:

"There are, without doubt, occasions in which private property may lawfully be taken possession of or destroyed to prevent it falling into the hands of the public enemy, and also where a military officer charged with a particular duty may impress private property into the public service, or take it for public use. Unquestionably, in such cases, the government is bound to make full compensation to the owner; but the officer is not a trespasser.

"But we are clearly of the opinion that in all these cases the danger must be immediate and impending, or the necessity urgent for the public service, such as will not admit of delay, and where the action of the civil authority would be too late in providing the means which the occasion calls for. It is the emergency which gives the right, and the emergency must be shown to exist before the taking can be justified."

The court held the plaintiff entitled to recover.·

The case of *Smith* v. *Shaw*, decided by the very able bench that constituted the Supreme Court of the State of New York in 1815, was a suit brought by a citizen against an army officer for false imprisonment during the war of 1812. The defense set up was that the plaintiff was a spy. The court said:

"If he was an American citizen he could not be charged with such an offense. He might be amenable to the civil authority for treason, but could not be punished under martial law as a spy."

It is urged that the power of the government to wage war is crippled unless it can arrest and imprison, by military force, disloyal persons. The necessity of arresting them is conceded, and, where the civil law and civil tribunals have been rendered powerless, we concede the right to use such military force. But, when the civil courts, in the midst of loyal communities, are exercising their ordinary jurisdiction, the appeal to the military arm or to martial law is needless. It is in the power of congress to enact laws which shall define offenses of this character, and bring to severe and merited punishment all persons guilty of aiding a public enemy. As already remarked, such a law was upon the statute book when this plaintiff was arrested, and it is not alleged, either in plea or argument, that he could not have been brought to an impartial trial in the northern district of Illinois. If congress should deem it necessary in time of war, it might go further, and enact, that a person arrested by the civil authorities on a sworn charge of giving aid and comfort to the enemy, should be held without bail until the meeting of the court and grand jury. It is not easy to see how the power of the government for successful war would be crippled, when furnished with such means of arresting disloyal persons, even though not able to arrest by means of military force in districts undisturbed by the war.

It is a fearful power that is claimed for the government by the counsel for the appellee, and one which no free government ought to possess. Even in England, in the latter part of the

last century, when secret political societies were formed hostile to the government and in league with the French revolutionists, or supposed to be so, although the country was at war with France, yet, while the high Tory administration of Mr. Pitt arrested, prosecuted, and punished with a pitiless vigor, it acted only through the ordinary agencies of the civil courts, and made no use of the military arm under the pretense that the offending persons were belligerents or public enemies. If this plaintiff was guilty of the charges made in the plea he merited arrest and a severe punishment, but he should have been punished in conformity to law. It is to be remembered that the question before us is one of power simply on the part of the executive, and not of deserving on the part of the plaintiff. If the President could rightfully arrest him by military force and consign him without process or trial to a fortress in the harbor of New York, he could do the same thing to any other person in the State of Illinois, however innocent of crime. This plaintiff may have been disloyal, and seeking to aid the rebels, but the most loyal citizen might have been arrested and sent away in the same summary manner. As no charge is made, no judicial investigation had, it is left entirely to the caprice of the government to determine what persons shall be seized. The power to thus arrest being once conceded, every man in the State, from the governor down to the humblest citizen, would hold his liberty at the mercy of the military officer in command. For it is to be borne in mind that this power is not one to be exercised only by the highest officers of the government, in whose hands it might be exercised with moderation. It is claimed for the President, as commander-in-chief, and as incident to a state of war. But if it exists at all it exists as the law of war or martial law, and may be exercised by the military officer in command of any district without reference to his rank, as rightfully as by the President himself. He might be afraid to exercise it without orders from his superior, but if it exists at all it belongs to him as well as to the President. This theory, then, pushed to its logical results, is this : That whenever the government is engaged in suppres-

sing a rebellion in Florida, or waging war on the frontiers of Maine, martial law may be enforced in Illinois, where there is neither war nor public enemy, and where the courts are daily administering justice; and every citizen of the State shall hold his liberty and property at the whim and discretion of the military officer in command. The proposition thus stated in its nakedness may well startle us, when we remember how liable we are to be involved in war. But it is not true, for it is utterly at variance with the most cherished objects of the Constitution and its most solemn prohibitions.

We are not unconscious of the fact that the decision which we are obliged to make in the present case, on the facts appearing in the record, attributes to our late lamented President the unlawful exercise of power, and therefore implies a certain degree of censure. None can have a higher appreciation than the members of this court of the unselfish patriotism and purity of motive of that great magistrate. If he exercised a power not given by the Constitution, he undoubtedly did so under a full conviction of its necessity in the extraordinary emergencies wherein he was called to act. But neither our honor for his memory, nor our confidence in his honesty, can be permitted to sway our judgment here. The questions presented by this record must be decided by us as questions of abstract law. If this plaintiff has been wrongfully restrained of his liberty, he has the right to call upon us so to declare, without fear, favor or affection. It is unfortunate that cases having a political or partisan character should come before the courts, but when they do so we must declare the law as we believe it to exist. If we can know any other motive than the simple wish to truly expound it, or if, when our convictions are clear, we should hesitate to declare them without reference to what party it may please, or what offend, we should betray the solemn trusts which the people have committed to this court, and bring dishonor on the administration of justice.

Our attention has been called by the counsel for the defendants to two acts of congress, the first of which, passed March 3, 1863, provides in its fourth section:

11 — 44TH ILL.

" That any order of the President or under his authority, made at any time during the existence of the present rebellion, shall be a defense in all courts to any action or prosecution, civil or criminal, pending or to be commenced, for any search, seizure, arrest or imprisonment made, done or committed, or acts omitted to be done, under and by virtue of such order or under color of any law of congress ; and such defense may be made by special plea or under the general issue."

The other act, passed May 11, 1866, provides in its first section that any arrest or imprisonment during the rebellion, by virtue of the order of the President, secretary of war or any military officer in command in the place where such arrest had been made or imprisonment had been inflicted, should come within the purview of the first act for all purposes of defense.

That it is the duty of congress to indemnify out of the public treasury any person who has been compelled to pay damages for an act performed by him in good faith, under the command of the President, for the purpose of suppressing the rebellion, is a proposition which few persons would deny. But the denial by congress, through a retrospective law, of all redress to a person whose property or liberty was illegally taken under a military order, is a mode of discharging obligations, which, however convenient, is not reconcilable with the principles of the Constitution. The Constitution confides to congress only legislative power, and that to be exercised only for specific purposes. When, therefore, it undertook to determine, in 1863 and 1866, that no injury to person or property committed prior to that time gave to the injured party a vested right of action, if committed under a military order, it assumed a judicial function which it is not authorized to perform. Whether this plaintiff was illegally arrested and imprisoned in 1862, depends solely upon the acts done and the laws in force, at that time; and these are facts to be determined by judicial investigation, and facts which no act of congress can change. If his personal liberty or property was illegally taken from him, then at once accrued to him a right to redress in the

courts, which no subsequent act of congress can take away. The rights of person and property are equally secured by the constitutional provision, borrowed from magna charta, that no person shall be deprived of them without due process of law. That congress has no power, by its own act, to divest these rights, is universally conceded, and we are unable to perceive the difference in principle between an act seeking to divest them directly, and one providing that, where they have been divested by unlawful violence, no remedy shall be had against the wrong-doer. Suppose congress should pass a law that no action should lie against United States marshals for any illegal acts theretofore done by them under color of their office, and a marshal should be sued for having, before the passage of the law, illegally taken the goods of one person under an execution against another. Can it be supposed such an act would be a defense to a suit brought for the trespass? And there is no difference in principle between such legislation and that now under consideration.

In 1862, on the facts disclosed by this record, one citizen of Illinois committed a trespass upon the rights of another for which the laws of Illinois then gave, and now give, a right of action. Since that time, congress has said, the action shall not be maintained. We must respectfully ask, whence comes the power to interfere with the remedies furnished by the State laws, through the State tribunals, for the injury of one citizen by another? There is really nothing to be said in support of this legislation. With all our respect for congress, we must hold these acts beyond its constitutional authority. If they are not so, its power over persons and property is limited only by its own discretion, and constitutional government is merely a theory.

There remains to be disposed of a question of practice. As has been already stated, only a portion of the defendants pleaded the special pleas. After judgment against the plaintiff had been rendered on the demurrer, and he had elected to abide by his demurrer, the court, against his objections and at the instance of those defendants who had pleaded only the general

issue, impaneled a jury to try that issue as to them. The
plaintiff declined to offer any evidence, and thereupon the jury
found a verdict for these defendants. The plaintiff contends
that they were not entitled to a trial of this issue, which is final
as to them, but that judgment should have been rendered in
their favor on the demurrer to the special pleas of their co-de-
fendants, so that in the event the judgment of the court on the
demurrer should be overruled, he might then have his recourse
against all the defendants. The rule is stated by Tidd, page
895, as follows:

" In actions of tort, as trespass, etc., where the wrong is joint
and several, where the plea of one defendant is such as shows
the plaintiff could have no cause of action against any of the
defendants, it shall operate to the benefit of all the defendants,
and the plaintiff cannot have judgment or damages against
those who let judgment go by default — but when the plea
merely operates in discharge of the party pleading it, then it
shall not operate to the benefit of the other defendants."

By this we understand that the defendant who has pleaded
the general issue only, may at his option claim the benefit of a
judgment on demurrer in favor of his co-defendant who has
pleaded specially, if such plea showed the plaintiff could not
maintain his action against either. We do not understand,
however, that he is obliged to do so. He has the right to insist
on a trial of the issue made by his own plea, and the plaintiff
cannot compel him to claim any benefit from the judgment on
the demurrer.

In the present case the plaintiff, on the trial of the general
issue, should have proved the trespass. If, under the rule
quoted from Tidd, the defendants had sought to avail them-
selves of the judgment of the court on the special plea of their
co-defendants, and the court had permitted it, the plaintiff
could have excepted, and preserved against them in the record
the same question raised by his demurrer to the special plea.
If they had not sought to do this, but the evidence had failed

to show their participation in the trespass, they would have been entitled to a verdict and judgment.

This judgment must be reversed and the case remanded. In order, however, that our decision may not be misconstrued, we deem it proper to add, that although the matter of the special pleas is not a bar to the action, yet, on the trial, the defendants will be permitted to prove the facts alleged in them in mitigation of damages, and for the purpose of rebutting the presumption of malice. For the purpose of enabling the jury to determine justly the *quantum* of damages to which the plaintiff may be entitled, the matters set up in these pleas will be, if proved, a proper subject of consideration.

*Judgment reversed.*

Separate opinion by Mr. JUSTICE BREESE:

I concur in much of the reasoning, and generally, in the conclusions reached in the above opinion. I cordially concur in the sentiment, that the Constitution of the United States was designed by its framers, and has been hitherto so understood by the people, to be the same protecting instrument in war as in peace; that a state of war does not enlarge the powers of any one department of the government established by it, nor has any one of these defendants any right to urge "necessity," or "extraordinary emergencies," as a plea for the usurpation of powers not granted. The first is the tyrant's plea, and the other places the dearest rights of the citizen at the mercy of a dominant party, who have only to declare "the emergency," which they can readily create, pretexts for which, bad men are keen to find and eager to act upon. There can be, and there should be, no higher law for the conduct of the government in its relations to the citizen, than the Constitution of the United States.

I cannot accede fully to the doctrine declared in the last clauses of the opinion. Holding, as we do, that the executive order under which the defendants attempt to justify their conduct, was illegal and void, it ought not to go in evidence for any purpose — it is not in the case. A subordinate ought not

to be permitted to extenuate his offense by the allegation, his superior ordered him to commit it. The marshal was not bound to execute the order, he knowing it was arbitrary and had not the sanction of the law. He should take all the consequences of his obedience.

In these disjointed times, under this ruling of the court, a jury might very easily be impaneled, who would not assess more than nominal damages for one of the greatest outrages ever perpetrated in a country claiming to be governed by a written constitution and having a code of laws.

But I do not suppose pecuniary considerations influenced the plaintiff to bring this action, but rather to vindicate that Constitution and the laws so grossly violated in his person. This he has effectually done, by the unanimous judgment of this court, in holding, that the proceedings of which he complains were without any warrant of law, and in direct and palpable violation of the letter and spirit of the Constitution.

At the September Term, 1867, the appellant entered his motion, that the foregoing opinion of the court be amended, so far as relates to the question of practice therein decided, whereupon the court delivered the following additional opinion:

Per Curiam: A motion has been made in this case by the appellant, that the court amend the opinion filed herein, so far as relates to the question of practice on the trial of the general issue pleaded by a portion of the defendants. The motion is overruled. The proper practice is correctly stated in the opinion. As therein stated, the defendants who pleaded the general issue had the right to have that issue, as to them, tried, and by insisting on such trial, to disclaim any benefit they might have claimed from a mistaken ruling of the court on the special plea. Their co-defendants had no right, by pleading a defective special plea, to compel them also to rest their defense upon a plea which they did not file, and thus be made liable to be brought again before the court for trial by a reversal of the judgment on the special plea, which might be had at any time

before the statute had barred a writ of error. An action of trespass is several as to each defendant, and each has a right to make his own defense and to have it tried, without being compelled to rely upon a defective defense made by a co-defendant. Counsel for appellant err in supposing they would not have been entitled to a judgment against the defendants who pleaded only the general issue if they had proved the trespass. When these defendants went to trial on that issue, declining to shelter themselves under the judgment of the court on the special plea, the court would have told the jury to find upon that issue only, and to assess the damages if they found the defendants guilty, and on that verdict the court would have rendered judgment. In remanding the case we reverse only the judgment on the demurrer. The judgment upon the verdict, as to those defendants who pleaded the general issue, and which is an entirely distinct and independent judgment, must stand.

We take this occasion to say, that the opinion hitherto filed in this case, in which the court below is directed to receive evidence of the facts set up in the special plea in mitigation of damages and to rebut the presumption of malice, must be construed as referring to vindictive or exemplary damages.

*Motion overruled.*